UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MIN KOU CHENETTE,                                   :
                          Plaintiff,        :   Index No.: 05-CV-4849 (DLC)(THK)
                                           :
        - against -                        :
                                         :   **DEFENDANT'S RULE 56.1**
KENNETH COLE PRODUCTIONS, INC.,   :   **STATEMENT OF UNDISPUTED**
                                         :   **MATERIAL FACTS**
                       Defendant.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Defendant Kenneth Cole Productions, Inc. (hereinafter "KCP"), by its attorneys, Epstein Becker & Green, P.C., pursuant to Local Civil Rule 56.1 of the United States District Court, Southern District of New York, hereby submits that Plaintiff cannot establish any genuine issue of material fact to be tried. The following material facts are undisputed based on the admissible evidence:

**A.    KCP's Anti-Discrimination Policies and Reporting Procedures**

       1.    At all times relevant to this lawsuit, KCP had a strict policy prohibiting any type of discrimination or harassment as embodied in the KCP Employee Handbook and Code of Conduct. (Berman Dep.[1] at 20-32; Affirmation of Traycee Ellen Klein in Support of Defendant Kenneth Cole Productions, Inc.'s Motion for Summary Judgment ("Klein Aff."), Ex. B, Employee Handbook, Sections I.H and I.I; Ex. C, Code of Conduct, "Non-Harassment.").

       2.    According to that policy, KCP is committed to a workplace that is free of discrimination or harassment based on race, color, creed, religion, age, sex, national origin, disability, marital status, sexual orientation, ancestry, alienage, citizenship, status as a veteran, or any other protected category and offensive or harassing behavior will not be tolerated against any employee. (Berman Dep. at 20-32; Klein Aff., Ex. B, Employee Handbook, Sections I.H and I.I; Ex. C, Code of Conduct, "Non-Harassment.").

       3.    Any employee who believes that he or she has been subjected to, or witnessed, conduct that violates KCP's policies prohibiting discrimination and harassment should promptly report the conduct, utilizing one of several reporting procedures that KCP makes available to its employees. (Klein Aff., Ex. B, Employee Handbook, Sections I.H, I.I; Klein Aff., Ex. C, Code of Conduct, "Associate Reporting Responsibilities").

       4.    The Employee Code of Conduct provides that:

           Associates should immediately report any suspected violation of
           the law or a Company policy in writing to their supervisor. If that

---

[1] A copy of the relevant pages from the transcript of the deposition of Shari Berman conducted in this litigation on April 17, 2008 ("Berman Dep.") is attached to the Klein Aff. as Exhibit A.

>   action is not practical, or does not correct the perceived violations, associates should contact the appropriate Director of Human Resources or another appropriate executive in the Human Resources Department. If the matter is too sensitive to be handled within the division, or the associate is not satisfied by the resolution at that level, he or she should immediately contact the Office of the General Counsel.

(Klein Aff., Ex. C, Code of Conduct, "Associate Reporting Responsibilities").

     5.    Similarly, the Employee Handbook advises that "[a]ny employee or applicant who feels he or she had been discriminated against or harassed should report such incident(s) and the name(s) of the individual(s) involved immediately to the Human Resources Department without fear of reprisal." (Klein Aff., Ex. B, Employee Handbook, Section I.I.).

     6.    The Employee Handbook also provides that "[a]ny employee who becomes aware of any discriminating or harassing behavior by any other employee should report such incident(s) and the name(s) of the individuals involved immediately to the Human Resources Department without fear of reprisal." (Klein Aff., Ex. B, Employee Handbook, Section I.I.).

     7.    The Employee Handbook and Code of Conduct also contain prohibitions against retaliation. (Klein Aff., Ex. B, Employee Handbook, Sections I.H and I.I; Ex. C, Code of Conduct, "Non-Harassment.").

     8.    According to the Employee Handbook, "[r]etaliation is a serious violation of the Company's sexual harassment policy and any act of retaliation should be immediately reported. Any person who retaliates against another individual for reporting any perceived acts of sexual harassment will be subject to discipline up to and including termination." (Klein Aff., Ex. B, Employee Handbook, Sections I.H and I.I.).

     9.    Similarly, the Code of Conduct provides that "[t]he Company will not retaliate against any associate who makes a good faith report pursuant to this policy, even if it turns out after investigation that there has not been a violation of law or corporate policy. (Klein Aff., Ex. C, Code of Conduct, "Non-Harassment.").

     10.    Every employee, including supervisors, is provided with a copy of the sexual harassment policy, Code of Conduct and Employee Handbook. (Berman Dep. at 29-30; Catropa Dep.[2] at 158; Montemarano Dep.[3] at 24-26; Affidavit of Vincent Montemarano, sworn to on May 23, 2003 ("Montemarano Aff."),[4] at ¶ 2).

     11.    In addition, training was consistently conducted for all employees of KCP's corporate office in New York, including review of the company's zero tolerance policy against

---

[2] A copy of the relevant pages from the transcript of the deposition of Gayle Catropa conducted in this litigation on April 30, 2008 ("Catropa Dep.") is attached to the Klein Aff. as Exhibit D.

[3] A copy of the relevant pages from the transcript of the deposition of Vincent Montemarano conducted in this litigation on April 18, 2008 ("Montemarano Dep.") is attached to the Klein Aff. as Exhibit E.

[4] The Montemarano Aff. is attached to the Klein Aff. as Exhibit F.

discrimination and harassment, reporting procedures and anti-retaliation policy. (Catropa Dep. at 25; Berman Dep. at 38, 42; Montemarano Dep. at 26-28).

**B.      Plaintiff's Employment at KCP**

12.    Plaintiff Minkou Chenette, a Korean female, interned for KCP in the Retail Planning Department during the fall semester of 2002 (September through December) and the International Licensing Department during the spring semester 2003 (January to June/July). (Pl. Dep.[5] at 172-85).

13.    On or about August 1, 2003, Plaintiff Minkou Chenette, a Korean female, was hired by KCP as a full-time employee in the position of International Licensing Coordinator in KCP's International Department (the "Department"). (Pl. Dep. at 182-85).

14.    At the time Plaintiff was hired, everyone knew that she was Korean. (Pl. Dep. at 190).

15.    Meredith Mace, Vice President of International Licensing, Ellen Rodriguez, the Senior Corporate Vice President of International and Business, and others, were responsible for hiring Plaintiff. (Pl. Dep. at 306).

16.    At the time that Plaintiff was hired and throughout the remainder of her employment with KCP, she did not have a college degree. (Pl. Dep. at 116-17).

17.    Prior to her employment with KCP, Plaintiff did not have any experience in licensing, except having interned at KCP as part of her college program. (Pl. Dep. at 162-63).

18.    At the commencement of her full-time employment, Plaintiff received a copy of KCP's Employee Handbook and signed a written acknowledgement that she had received and reviewed the Handbook. (Pl. Dep at 187-91; Klein Aff., Ex. H, Handbook Acknowledgement, dated August 4, 2003).

19.    Plaintiff acknowledged that she was familiar with KCP's reporting procedures. (Pl. Dep. at 192-93).

20.    Shortly after beginning her employment with KCP, Plaintiff believed that she was ready to be promoted. (Pl. Dep. at 298-99, 302-04, 325-28, 338-39).

**C.      The International Department is Reorganized**

21.    From November 2003 until late March early April, Vincent Montemarano was the Director of International Licensing of Asia, responsible for managing and overseeing KCP's partners in Hong Kong, Taiwan, Singapore, Malaysia, the Philippines, and Korea. (Montemarano Aff. at ¶¶ 3, 7).

---

[5] A copy of relevant pages from the transcript of the deposition of Plaintiff conducted in this litigation, occurring on March 4 and April 10, 2008 ("Pl. Dep.") is attached to the Klein Aff. as Exhibit G.

3

22.     In late March/Early April 2004, Mr. Montemarano was promoted to Vice President for International Licensing.  (Montemarano Aff. at ¶ 7).

23.     The Vice President for International Licensing position had previously been occupied by Meredith Mace, who left KCP in early 2004.  (Montemarano Aff. at ¶ 7).

24.     As a result of Ms. Mace leaving KCP and Mr. Montemarano being promoted, Ms. Rodriguez, the Senior Corporate Vice President of International and Business Development, and Mr. Montemarano, along with individuals from KCP's Human Resources Department decided to reorganize the International Department.  (Montemarano Aff. at ¶ 7; Montemarano Dep. at 73).

25.     Because Mr. Montemarano was still going to retain some responsibility for Asia, KCP made the business decision not to fill his former position (Director of Asia), but instead create a position more junior than Director but more senior than a Coordinator.  (Montemarano Aff. at ¶ 9; Montemarano Dep. at 81).

26.     The new position was entitled "Associate Manager," and needed to be filled with someone that had licensing experience (either domestic or international), retail analyst experience, and someone that was able to travel regularly.  (Montemarano Aff. at ¶ 9; Montemarano Dep. at 79-82).

27.     The Associate Manager was going to take on some, but not all, of Mr. Montemarano's former responsibilities.  (Montemarano Aff. at ¶ 9; Montemarano Dep. at 80-84).

28.     In May 2004, KCP extended an offer for the Associate Manager position to Dana Boehmcke.  (Montemarano Aff. at ¶ 10).

29.     At the time of the offer, Ms. Boehmcke had been working for approximately two years as the Licensing Project Coordinator for Nautica, a business similar to KCP.  (Montemarano Aff. at ¶ 10, Ex. A; Montemarano Dep. at 21-23).

30.     In her prior position at Nautica, Ms. Boehmcke had domestic licensing and retail analyst experience.  (Montemarano Aff. at ¶ 10, Ex. A; Montemarano Dep. at 21-23).

31.     Prior to her two years experience at Nautica, Ms. Boehmcke had received her Bachelor of Science degree and had previously interned in the Department for KCP.  (Pl. Dep. at 332; Montemarano Aff. at ¶ 10, Ex. A; Montemarano Dep. at 21-23).

32.     In mid May 2004, Ms. Boehmcke accepted KCP's offer of employment to work as the Associate Manager of Asia.  (Montemarano Aff. at ¶ 10).

33.     At the time of the offer of employment to Ms. Boehmcke, KCP had an employee working in the Department by the name of Rachel Packer.  (Montemarano Aff. at ¶ 4).

34.     As of March 2004, Ms. Packer had been employed by KCP as a Coordinator in the Department for approximately two and a half years.  (Montemarano Aff. at ¶ 4).

4

35.     By that time, Ms. Packer had been employed for approximately one and half years before Plaintiff was hired at KCP.  (Pl. Dep. at 318).

36.     Ms. Packer was employed as a Coordinator for the United Kingdom and Europe.  (Pl. Dep. at 344; Montemarano Aff. at ¶ 4; Montemarano Dep. at 11-12).

37.     Because Ms. Packer had been working for KCP as a Coordinator for essentially the same amount of time that Ms. Boehmcke had worked for Nautica as a Coordinator, and Ms. Packer, like Ms. Boehmcke, had her undergraduate degree, it was decided by Ms. Rodriguez, Mr. Montemarano and the HR Department that Ms. Packer would be promoted to the title of "Associate Manager."  (Montemarano Aff. at ¶ 11; Montemarano Dep. at 73-75, 87).

38.     As Associate Manager, Ms. Packer took on responsibility for Canada and the Middle East, in addition to the responsibilities that she had as the Coordinator for the United Kingdom and Europe.  (Montemarano Aff. at ¶ 11; Montemarano Dep. at 73-75).

39.     Ms. Packer's change of title to Associate Manager was effective May 17, 2004.  (Montemarano Aff. at ¶ 11; Montemarano Dep. at 73-75).

40.     It was also decided at this time not to hire a Coordinator to replace Ms. Packer and thus, the Department would only have one Coordinator position, the one filled by Plaintiff.  (Montemarano Aff. at ¶ 12).

41.     Mr. Montemarano did not consider Plaintiff to be qualified for the Associate Manager position.  (Montemarano Dep. at 78-79).

42.     At the time, Plaintiff was still working on her undergraduate degree and had only been employed in the entry level position of Coordinator since August of 2003.  (Pl. Dep. at 331, 350).

43.     Other than her experience at KCP, Plaintiff did not have any other licensing or international business experience.  (Pl. Dep. at 162-63).

44.     Upon information and belief, Plaintiff did not have any retail analytical experience.  (Montemarano Aff. at ¶ 12; Pl. Dep. at 162-63).

45.     At the time, KCP understood that Plaintiff was still in school and attending classes and believed that she could not travel as required by the position. (Pl. Dep. at 350; Montemarano Aff at ¶ 12; Montemarano Dep. at 78-79).

46.     On or about May 17, 2004, at one of the regularly scheduled team meetings, Ms. Rodriguez and Mr. Montemarano announced to the group that Ms. Boehmcke was going to be joining the Department as an Associate Manager on June 7 and that Ms. Packer had been promoted to Associate Manager.  (Pl. Dep. at 336; Montemarano Aff. at ¶ 13; Montemarano Dep. at 84-85).

5

47. Plaintiff admits that she not apply for the position of Associate Manager, International Licensing responsible for Europe, Canada and the Middle East. (Pl. Dep. at 325-26).

48. Plaintiff discussed the possibility of advancement to an Associate Manager position with Mr. Montemarano because that would be the next step for a Coordinator but never actually applied for a particular promotion to a specific Associate Manager position. (Pl. Dep. at 298-99, 302-04, 325-28, 338-39).

49. Mr. Montemarano never promised Plaintiff a position of Associate Manager. (Pl. Dep. at 328).

50. Plaintiff does not believe that she was denied a promotion because of her sex or gender. (Pl. Dep. at 315:5-21).

51. At her deposition, Plaintiff was asked what evidence she believes supports her claims that she was denied a promotion based on her national origin. (Pl. Dep. at 305, 313, 328).

52. Plaintiff testified that Ms. Packer told her that Meredith Mace, her former supervisor, did not like her because she was Korean. (Pl. Dep. at 305-06, 312-14).

53. Plaintiff testified that Ms. Packer made a comment at a meeting that "all Koreans are alike" and that her supervisors were present and did nothing about it. (Pl. Dep. at 352-54).

54. Plaintiff testified that when Mr. Montemarano would instruct her to take care of the Asian licensees, he would make statements such as "you know them better than I do, so you do it" and "you know them. You handle them." (Pl. Dep. at 364, 446).

55. Plaintiff testified that Ms. Rodriguez and Mr. Montemarano favored Ms. Packer and had a better, more friendly relationship with her. (Pl. Dep. at 316-21).

56. Plaintiff testified that Mr. Montemarano hired a Caucasian women (Ms. Boehmcke) who he previously knew from his former employer Nautica. (Pl. Dep. at 328-33).

57. Prior to the decision to restructure the Department, KCP was not aware of any complaints by employees of the Department, including Plaintiff, about discriminatory, harassing, offensive or inappropriate comments or conduct or that any employees in the Department had engaged in such conduct, including Ms. Packer; and Plaintiff admits that Ms. Rodriguez and Mr. Montemarano did not engage in any discriminatory conduct towards her based on her national origin. (Pl. Dep. at 195-200, 207-08, 314, 367-69, 408, 412, 424; Montemarano Aff. at ¶ 18; Montemarano Dep. at 44-45, 63-67; Catropa Dep. at 153-58; Kim Dep.[6] at 36-38, 122-23).

---

[6] A copy of the relevant pages from the transcript of the deposition of Renee Kim conducted in this litigation on April 28, 2008 ("Kim Dep.") is annexed to the Klein Aff. as Exhibit I.

6

### D.    Plaintiff's Declining Performance and Unacceptable Behavior Lead to a Mid-Year Review on June 17, 2004

58.    Soon after the announcement about the changes in the Department, it came to Mr. Montemarano's attention that Plaintiff had started spreading rumors throughout the Department that Ms. Boehmcke did not have any licensing experience and insinuating that she was not competent for the position for which she was hired. (Montemarano Aff. at ¶ 14: Montemarano Dep. at 92).

59.    Mr. Montemarano considered this conduct not only to be unprofessional, but also untrue. (Montemarano Aff. at ¶ 14).

60.    During Plaintiff's employment with KCP, and prior to her spreading the rumors about Ms. Boehmcke, Plaintiff had engaged in other conduct that in the opinion of Mr. Montemarano was unprofessional. (Montemarano Aff. at ¶ 15; Montemarano Dep. at 49-52, 55-60, 88-89, 102, 123-24, 129).

61.    Mr. Montemarano and Ms. Rodriguez were of the opinion that Plaintiff had performance problems in the area of Interpersonal Skills, which is defined by KCP to include Communication, Adaptability, and Internal Relations. (Montemarano Aff. at ¶ 15; Montemarano Dep. at 92-97).

62.    As a result of these perceived problems, Ms. Rodriguez and Mr. Montemarano decided to administer a six month review for Plaintiff. (Montemarano Aff. at ¶ 6; Montemarano Dep. at 88, 121-24).

63.    Mr. Montemarano administered the review to Plaintiff on June 17, 2004. (Montemarano Aff. at ¶ 16, Ex. C; Montemarano Dep. at 87-88).

64.    Managers and supervisors at KCP are entitled to give off cycle performance reviews. (Kim Dep. at 59).

65.    In the June 17 review, Plaintiff received a rating of "U," performance unacceptable, in the categories of "Communications," "Adaptability" and "Internal Relations" noting that "inappropriate communication within the department has lead to a negative working environment" and of "[n]umerous hostile relationships both internally and externally over the last 6 months [that have] lead to inability to develop professional business relationships." (Montemarano Aff. at ¶ 16, Ex. C).

66.    Prior to her June 17, 2004 performance review, Plaintiff had never complained to Mr. Montemarano about discriminatory conduct because she is Korean, Asian or female. (Pl. Dep. at 408).

### E.    Plaintiff Complains About Her Performance Review and the Packer Promotion

67.    On or about June 28, 2004, Plaintiff complained to Renee Kim about her June 17, 2004 performance review and that the promotion of Ms. Packer was unfair. (Pl. Dep. at 424; Catropa Dep. at 35-36; Kim Dep. at 56-63).

7

NY:2626449v2

68. At the time, Ms. Kim, a Korean women like Plaintiff, held an entry level position of Coordinator in KCP's Human Resources Department. (Kim Dep. at 119).

69. Plaintiff, in griping to Ms. Kim about the performance appraisal and the promotion, expressed her opinion to Ms. Kim that it was unfair that Ms. Packer got the promotion and, in sum and substance, that "Vince favors [Ms. Packer] even though she" called Plaintiff a "crazy Korean" and "Korean whore." (Pl. Dep. at 413; Kim Dep. at 61-62; Montemarano Aff. at ¶ 18; Isaak Dep. at 57-58).

**F.     KCP Takes Corrective Action In Response to Plaintiff's Initial Complaints Regarding Her Performance Review and the Packer Promotion**

70. In response to Plaintiff's statements, Ms. Kim advised her to speak to Ms. Rodriguez, the head of her Department, or to Human Resources and suggested her supervisor, Gayle Catropa, Vice President of Human Resources. (Kim Dep. at 62-63).

71. Plaintiff did not want Ms. Kim to report her complaints to Human Resources. (Pl. Dep. at 414-15; Kim Dep. at 65-66; Catropa Dep. at 35).

72. Despite this, immediately after speaking with Plaintiff, Ms. Kim reported her discussion with Plaintiff to her supervisor, Ms. Catropa. (Kim Dep. at 22-24, 123-25).

73. At that time, Ms. Catropa had over six years of human resources experience both at KCP and her previous employer, Loehmann's. (Catropa Dep. at 6-12).

74. By June 2004, Ms. Catropa had been involved in more than 20 investigations of discrimination and harassment as an HR professional. (Catropa Dep. at 12-22).

75. Upon instruction from Ms. Catropa, Ms. Kim advised Plaintiff that she had to speak with Human Resources within 24 hours to address her complaints. (Catropa Dep. at 35, 38; Kim Dep. at 64-68).

76. An interview with Ms Catropa and Ms. Kim was scheduled for June 30, 2004 but Plaintiff did not come to the meeting. (Pl. Dep. at 419-420; Kim Dep. at 71; Catropa Dep. at 39-41).

77. Plaintiff sent an email to Ms. Kim wanting to "reschedule" the meeting. (Pl. Dep. at 419-20; Kim Dep. at 71; Catropa Dep. at 39-41).

78. Ms. Kim tried finding Plaintiff to find out why she was rescheduling. (Kim Dep. at 71-72).

79. Ms. Kim had her paged several times and then ultimately found Plaintiff in one of KCP's conference rooms on the phone with her husband. (Pl. Dep. at 420; Kim Dep. at 72).

80. When Plaintiff hung up the phone Ms. Kim told Plaintiff that they would need to get Ms. Rodriguez involved. (Kim Dep. at 76).

81. Plaintiff got very upset at Ms. Kim, picked up the phone and called her husband back and told him "to get Mark on the phone." (Pl. Dep. at 420-21; Kim Dep. at 76).

82. In response to Plaintiff's discussion with Ms. Kim, even though Plaintiff would not cooperate and did not want to meet with HR, KCP immediately took action. (Catropa Dep. at 43-45; Kim Dep. at 82, 91-93, 96-99).

83. First, on June 30, 2004, Ms. Rodriguez met with Plaintiff and Ms. Kim, and she acknowledged the conversation that took place between Ms. Kim and Plaintiff on June 28, 2004. (Pl. Dep. at 421-22; Kim Dep. at 91-93, 96-99; Klein Aff., Ex. J, Memorandum from Renee Kim, dated June 30, 2004).

84. Ms. Rodriguez informed Plaintiff that she was sorry if someone in the Department had said something offensive and that she would speak to the Department, essentially to make sure it did not happen again. (Kim Dep. at 91-93; Klein Aff., Ex. J).

85. Ms. Rodriguez then addressed the performance review that had been administered and which obviously had Plaintiff very upset. (Pl. Dep. at 421-22; Kim Dep. at 91-93, Klein Aff., Ex. J).

86. Ms. Rodriguez told Ms. Kim that the performance review was not a stain on her career, but was meant to address the problems with her performance and was hopefully going to result in her "steering her ship back on course," so she would have a long fruitful career at KCP. (Pl. Dep. at 421-22; Kim Dep. at 91-93, Klein Aff., Ex. J; see also Montemarano Dep. at ¶ 17).

87. Second, Ms. Rodriguez and Mr. Montemarano then held a Department wherein they reminded everyone that even though they all have great relationships and work in a "casual corporate environment" everyone had to be sensitive to the fact that it was a work environment and that while they may be friends they were also business colleagues, i.e. to "mind their ps and qs". (Pl. Dep. at 426-20; Montemarano Aff. at ¶ 19; Montemarano Dep. at 100-01; Isaak Dep.[7] at 38).

88. During this meeting the Department was also told that if they ever felt uncomfortable, had any problems, issues, questions or concerns, that they were to immediately report them to Ms. Rodriguez or the HR Department. (Montemarano Aff. at ¶ 19; Montemarano Dep. at 100-01).

89. During the relevant time period, there was never another incident of offensive or inappropriate comments within the International Licensing Department after this meeting. (Pl. Dep. at 476; Montemarano Aff. at ¶ 20, Catropa Dep. at 46).

90. After she complained to Renee Kim on June 28, 2004 through the date of her resignation, Plaintiff was never again subjected to any alleged offensive comments or inappropriate conduct based on her national origin, race or sex in KCP's workplace. (Pl. Dep. at 431).

---

[7] A copy of the relevant pages from the transcript of the deposition of Berly Isaak (maiden name DeLaCruz) conducted in this litigation on May 1, 2008 ("Isaak Dep.") is attached to the Klein Aff. as Exhibit K.

G. **Immediately Upon Receipt Of Plaintiff's Counsel's July 12, 2004 Letter Indicating For The First Time That Plaintiff Believed She Was The Victim Of Discrimination And Harassment, KCP Commenced A Thorough, Fair and Impartial Investigation**

91. On or about July 12, 2004, KCP received a letter from an attorney by the name of Mark Schwartz, Esq., indicating that he represented Plaintiff and that he believed that Plaintiff had been the victim of discrimination and harassment. (Klein Aff., Ex. L, Letter from Mark Schwartz to Michael Colosi, dated July 12, 2004).

92. On or about July 19, 2004, KCP received a second letter from Mark Schwartz, Esq., this time detailing Plaintiff's allegations of harassment. (Klein Aff., Ex. M, Letter from Mark Schwartz to Michael Colosi, dated July 19, 2004).

93. This was the "Mark" that Plaintiff had instructed her husband to get on the phone on June 30, 2004, the day that Plaintiff refused to meet with Ms. Catropa of the HR Department. (Pl. Dep. 420-21; Kim Dep. at 76).

94. Plaintiff told Ms. Kim at some point that "Mark," who she identified as a lawyer, did not want her to speak with the HR Department or Ms. Rodriguez. (Pl. Dep. at 414-16; Kim Dep. at 78-79).

95. The allegations in the letters by Mr. Schwartz were strikingly different than what Plaintiff had told Ms. Kim on June 28, 2004. (Pl. Dep. at 52-53, 56, 121-22, 413, 424; Klein Aff., Ex. M; Kim Dep. at 61-62; Catropa Dep. at 35-36).

96. Immediately upon receipt of these letters, KCP undertook a prompt, impartial and thorough investigation into Plaintiff's allegations of discrimination and harassment in accordance with its standard practice and in accordance with guidance provided from the EEOC and outside counsel. (Berman Dep. at 52-53, 69-171; Catropa Dep. at 13-18, 77-145).

97. Shari Berman, Assistant General Counsel, who was involved in the investigation had prior experience handling investigations into allegations of workplace grievances, including discrimination and harassment litigation at her prior law firm and approximately five workplace investigations during her employment at KCP that were handled in conjunction with Human Resources. (Berman Dep. at 66-70).

98. As part of the investigation, KCP interviewed all employees, current and former, from the International Licensing Department who they believed had information relevant to the investigation. They also interviewed employees from other departments believed to have relevant information. The employees interviewed were:

    a    Berly DeLaCruz (Catropa Dep. at 84; Berman Dep. at 71-72);

    b    Courtney Leshin (Berman Dep. at 71, 146);

    c    Hyun Lim (Catropa Dep. at 84; Berman Dep. at 71, 139);

    d    Dana Boehmcke (Catropa Dep. at 84);

10

    e    Meredith Mace (Catropa Dep. at 84; Berman Dep. at 71, 143);

    f    Jackie Kontizas (Catropa Dep. at 84; Berman Dep. at 71, 141);

    g    Jenny Markusfeld (Catropa Dep. at 84; Berman Dep. at 71, 137);

    h    Dara Hockstein (Catropa Dep. at 84; Berman Dep. at 147);

    i    Cindi Shapiro (Catropa Dep. at 84112-13; Berman Dep. at 71, 139);

    j    Wes Hatachi (Berman Dep. at 71-72, 130);

    k    Karen Duchensky. (Berman Dep. at 71-72, 135);

    l    Renee Kim (Berman Dep. at 154);

    m    Vincent Montemarano (Montemarano Dep. at 104-105; Catropa Dep. at 89; Berman Dep. at 74-77);

    n    Ellen Rodriguez (Catropa Dep. at 89, 91; Berman Dep. at 114, 148-49); and

    o    Rachel Packer. (Catropa Dep. at 93; Berman Dep. at 149-150).

99.    At first, Plaintiff would not participate in the investigation. (Pl. Dep. at 438-440).

100.    Finally, on August 24, 2004, Shari Berman and Gayle Catropa interviewed Plaintiff. (Complaint at ¶ 37; Catropa Dep. at 139; Berman Dep. at 154-55).

101.    Although it was not standard policy, as a concession to Plaintiff, KCP allowed her attorney to be present during the interview. (Berman Dep. at 159-60).

102.    The interview was also videotaped at request of Plaintiff's attorney. (Berman Dep. at 155-57).

103.    The beginning of the interview did not go smoothly, as Plaintiff's counsel kept wanting to speak on her behalf, and Plaintiff wanted to simply rely on her lawyer's letters rather than cooperate and speak with Ms. Berman and Ms. Catropa. (Catropa Dep. at 139-42; Berman Dep. at 159-64).

104.    After many breaks and many interruptions, KCP and its employee, Plaintiff, decided that they would break for the day and that Plaintiff would meet Ms. Berman and Ms. Catropa on the following work day so they could complete their interview with her. (Pl. Dep. at 436-37; Catropa 141-42; Berman Dep. at 163-64).

105.    Plaintiff never returned to work and instead, on August 25, 2004, sent Mr. Montemarano a resignation letter. (Pl. Dep. at 64-65, 472-80; Berman Dep. at 156; Montemarano Dep. at 111; Klein Aff., Ex. N, Resignation Letter, dated August 25, 2004).

11

106. The very next day, August 26, 2004, Ms. Catropa sent Plaintiff a letter on behalf of KCP and asked her to reconsider her decision. (Catropa Dep. at 135-36; Klein Aff., Ex. O, Letter from Gayle Catropa to Plaintiff, dated August 26, 2004).

107. In this letter, Ms. Catropa explained that she understood how Plaintiff might be stressed and emotional, but that she should not make a rash decision. Ms. Catropa stated that Plaintiff should allow the investigation to take its normal course and give KCP the opportunity to correct any wrongdoing by employees, if found. (Klein Aff., Ex. O).

108. Plaintiff never responded to Gayle Catropa's August 26 letter and never returned to work at KCP. (Pl. Dep. at 64-65, 473; Catropa Dep. at 141-42; Berman Dep. at 156).

109. Prior to receipt of Plaintiff's lawyer's letters, Ms. Berman was unaware of Plaintiff's complaints or any other complaints regarding discriminatory, inappropriate or offensive conduct in the International Licensing Department. (Berman Dep. at 51-52).

110. Prior to July 21, 2004, Ms. Catropa had not been aware of any employee from the International Licensing Department complaining about being uncomfortable in the workplace, offensive conduct in the workplace, that Rachel Packer acted inappropriately or had made any derogatory comments about sex or national origin, or that Vince Montemarano, Ellen Rodriguez or Meredith Mace had acted inappropriately or been present for any offensive or inappropriate conduct. (Catropa Dep. at 153-58).

**H.    The Environment in the International Licensing Department**

111. The International Licensing Department at KCP was a small group of people that were very close, both in and outside the workplace. (Pl. Dep. at 210; Isaak Dep. at 58; Kim Dep. at 30-31; Montemarano Aff. at ¶ 6, Ex. A, pictures of Plaintiff interacting and socializing outside of the workplace with her colleagues from KCP and the Department).

112. The work environment within the Department was generally described as casual, friendly and outgoing. Pl. Dep. at 210; Isaak Dep. at 58; Kim Dep. at 30-31; Montemarano Aff. at ¶ 6).

113. The employees in the Department ate lunch together in the Café, they went out socially, and they went over one another's apartments and houses. (Pl. Dep. at 210; Isaak Dep. at 58; Kim Dep. at 30-31; Montemarano Aff. at ¶ 6).

114. Employees would often engage in "girl talk" about non-work related topics such as dating, sex, boyfriends, husbands and children, including a conversation about purchasing bras and another about the cost of vibrators. (Pl. Dep. at 219-20, 462-63; Isaak Dep. at 26-27; Montemarano Dep. at 69).

115. According to Plaintiff's colleague's, Plaintiff regularly contributed to the casual environment in the Department and made comments and engaged in conduct of a sexual nature. (Isaak Dep. at 26-27, 50-51, 54-58, 66, 79-80; Kim Dep. at 31-35).

NY:2626449v2

**I.      Cyndi Shapiro**

116.    Plaintiff, in her Complaint, alleges that on May 28, 2004, she was kissed on the lips by Cyndi Shapiro who was apologizing for being nasty to Plaintiff on the telephone the day before.  (Complaint at ¶ 21).

117.    On June 1, 2004, Plaintiff allegedly informed Mr. Montemarano about this incident.  (Complaint at ¶ 22).

118.    Plaintiff does not, and did not, believe that Ms. Shapiro kissed her because she is a female or because she is Korean.  (Pl. Dep. at 200:2-7).

119.    Plaintiff claims that after this incident, she was made to take a taxicab with Ms. Shapiro to a work meeting and that this was retaliatory.  (Pl. Dep. at 410).

120.    Plaintiff admits that there was a third person in the cab and that she was neither forced to take the cab with Ms. Shapiro by anyone at KCP nor even asked to take the cab with Ms. Shapiro by anyone at KCP.  (Pl. Dep. at 410).

121.    During the investigation, it was determined that Ms. Shapiro had violated KCP policy by allegedly kissing Plaintiff and as a result, Ms. Shapiro was issued a Final Warning for her conduct.  (Catropa Dep. at 113-19; Klein Aff., Ex. P, Incident Warning, dated August 2004, and issued September 17, 2004).

**J.      Plaintiff's Allegations Of A Hostile Work Environment At KCP**

122.    At her deposition, Plaintiff was asked to identify all the comments and/or conduct that she believed caused her to be subjected to a hostile work environment during her employment because of her sex.  (Pl. Dep. at 441).

> a       Plaintiff testified that Rachel Packer had an "unfiltered mouth" and would talk about personal things in the workplace (for example, she would say "oh, I got to go change my tampon.") (Pl. Dep. at 368-69).
>
> b       Plaintiff testified that on another occasion, Plaintiff and Ms. Packer were sitting together when an African American employee walked by them and Ms. Packer asked Plaintiff "don't you think he has a big penis?"  (Pl. Dep. at 370).
>
> c       Plaintiff testified that when the employee walked by again, Ms. Packer made a gesture like she was "sucking something" and laughed.  (Pl. Dep. at 370).
>
> d       Plaintiff testified that Ms. Packer made comments on the size of Plaintiff's breasts and poked her once.  (Pl. Dep. at 203, 525).
>
> e       Plaintiff testified that on another time, Ms. Packer asked Plaintiff if she was an "Asian porn star."  (Pl. Dep. at 441).

13

   f  Plaintiff testified that Mr. Montemarano made a comment during a conversation at lunch about "little boys giving each other head."  (Pl. Dep. at 442).

  123. Plaintiff conceded at her deposition, however, that she was not subjected to any conduct during her employment with KCP "because" she was a female as opposed to a male.  (Pl. Dep. at 202).

  124. Plaintiff also claims that her co-workers engaged in a conversation about circumcisions that was unprofessional and uncomfortable.  (Pl. Dep. at 212-13).

  125. Plaintiff, however, acknowledges that she was not subjected to this conversation because of her national origin, race or sex.  (Pl. Dep. at 213).

  126. Plaintiff was also asked at her deposition to identify all of the comments and/or conduct that she believed caused her to be subjected to a hostile work environment during her employment because of her national origin and/or race.  (Pl. Dep. at 444-45).

   a  Plaintiff testified that Rachel Packer told Plaintiff that Plaintiff's former supervisor, Meredith Mace, did not like her because she is Korean.  (Pl. Dep. at 306).

   b  Plaintiff testified that Ms. Packer mocked a Korean licensee's nasally accent.  (Pl. Dep. at 206).

   c  Plaintiff testified that during a work meeting, a Korean licensee fell asleep, and Ms. Packer stated words to the effect that "all Koreans are alike."  (Pl. Dep. at 205, 353).

   d  Plaintiff testified that Mr. Montemarano told her to take care of her Asian licensees because "you know them better than I do, so you do it," or "you know them you can handle them."  (Pl. Dep. at 364, 446).

   e  Plaintiff testified that Ms. Packer's statement to Plaintiff that "aren't you [an] Asian porn star" was related to her national origin and/or race (Pl. Dep. at 441).

   f  Plaintiff testified about an incident in which Ms. Packer made fun of a female Korean licensee whose last name was Ho by saying the licensee's last name with a "funny accent" or while "pos[ing]" and people would laugh.  (Pl. Dep. at 447).

  127. Plaintiff testified that she liked her job and that working at KCP was a great opportunity.  (Pl. Dep. at 210-211).

14

  128. Plaintiff was also asked at her deposition to identify all of the comments and/or conduct that she believed was retaliatory. (Pl. Dep. at 381-406).

    a Plaintiff testified that the performance review that was administered on June 17, 2004 was retaliatory, in that Mr. Montemarano knew that Plaintiff was unhappy that Ms. Packer received a promotion. (Pl. Dep. at 361-62).

    b Plaintiff also testified that she told Mr. Montemarano that an employee had once kissed her on the lips and in response, she claims he told her not to go to Human Resources, gave her a bad performance review, and made her share a taxicab to go to a meeting with the employee who kissed her. (Pl. Dep. at 410-11).

    c Plaintiff also states that KCP's interview of her in connection with her claims of discrimination and its investigation thereof was retaliatory. (Pl. Dep. at 384).

    d Lastly, Plaintiff claimed at her deposition that a letter that was sent to her after she quit asking her to reconsider this decision was also somehow "retaliatory" in nature. (Pl. Dep. at 384).

Dated: New York, New York      EPSTEIN BECKER & GREEN, P.C.
    May 23, 2008

                 By: /s/ Traycee Ellen Klein
                    Traycee Ellen Klein
                    Howard Schragin

                 250 Park Avenue
                 New York, New York  10177
                 (212) 351-4812
                 (212) 661-0989 (fax)
                 tklein@ebglaw.com
                 hschragin@ebglaw.com
                 Attorneys for Defendant
                 *Kenneth Cole Productions, Inc.*