UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                         :
MIN KOU CHENETTE,                        :
                         Plaintiff,      :
                                         :    05 Civ. 4849 (DLC)
            -v-                          :
                                         :    OPINION & ORDER
KENNETH COLE PRODUCTIONS, INC.,          :
                         Defendant.      :
                                         :
----------------------------------------X

Appearances:

For Plaintiff:

E. Christopher Murray
Reisman, Peirez & Reisman, L.L.P.
1305 Franklin Avenue
Garden City, New York 11530

For Defendant:

Traycee Ellen Klein
Howard Schragin
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York 10177


DENISE COTE, District Judge:

    Defendant Kenneth Cole Productions ("KCP") moves for

summary judgment in this employment discrimination action

brought by Min Kou Chenette ("Chenette"), a former employee.

Chenette alleges that KCP discriminated against her on the basis

of her sex, race, and national origin in violation of Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

("Title VII"), as well as various provisions of the New York

State Human Rights Law (NYSHRL) and New York City Human Rights Law (NYCHRL).[1]  For the following reasons, the defendant's motion for summary judgment is granted as to Chenette's claims of discriminatory failure to promote, constructive discharge, and hostile work environment, but it is denied in part as to her retaliation claims.

BACKGROUND

Unless otherwise noted, the following facts are either undisputed, taken from the plaintiff's deposition,[2] or taken in the light most favorable to the plaintiff.  Chenette immigrated to the United States from South Korea as a teenager.  While attending college, she began her employment at KCP as an intern in the Retail Planning Department during the fall semester of 2002.  In the spring semester of 2003, Chenette worked as an

---

[1] Although the Complaint also alleges several common law claims, including intentional and negligent infliction of emotional distress, assault, and libel, Chenette withdrew these claims before KCP filed its motion for summary judgment.

[2] In opposition to this motion for summary judgment, Chenette has submitted transcripts of the depositions she took of several KCP employees, various documents including her performance review, and an affidavit.  "Factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts the plaintiff's own prior deposition testimony." Rubens v. Mason, 387 F.3d 183, 192 (2d Cir. 2004) (citation omitted).  Therefore, to the extent that Chenette's affidavit contradicts her deposition testimony, it has been disregarded here.

intern in KCP's International Licensing Department. That summer, KCP hired Chenette to work full-time as an International Licensing Coordinator in its International Licensing Department, a position she held until her resignation from KCP in August 2004. Throughout this time, Chenette was working toward obtaining a college degree, but she had not yet graduated by the time of her resignation.

Throughout the time of Chenette's employment at KCP, the defendant maintained written antidiscrimination policies and reporting procedures, which it included in the Employee Handbook and Code of Conduct. Chenette was provided with a copy of the Employee Handbook when she began her full-time employment at KCP. She signed an acknowledgment form stating that she had received and reviewed the Employee Handbook. KCP's reporting procedures provided:

> Associates should immediately report any suspected violation of the law or a Company policy in writing to their supervisor. If that action is not practical, or does not correct the perceived violations, associates should contact the appropriate Director of Human Resources or another appropriate executive in the Human Resources Department.

(emphasis added).

With the exception of the Department's Vice President,
Vince Montemarano,[3] all members of KCP's International
Licensing Department during Chenette's tenure were women.
The employees sometimes socialized with one another outside
of the workplace, and the work environment within the
department was undoubtedly casual.  Conversation among the
employees contained sexual and racial content, and topics
of discussion included, for example, bras and vibrators.
Chenette alleges that on one occasion, Mr. Montemarano, who
was also Chenette's supervisor, made a comment suggesting
sexual conduct between young brothers.  Chenette also
alleges that Rachel Packer, a KCP Licensing Coordinator,
would imitate how Koreans spoke and made derogatory
statements about Korean licensees who fell asleep in
meetings.  Apart from these statements and those described
below, however, the racially charged comments to which
Chenette cites referred to African Americans and Hispanics.

In March 2004, when she had been employed by KCP for
approximately seven months, Chenette discussed with Mr.
Montemarano her interest in being considered for the position of
Associate Manager as "the next step" in her employment.  On May
17, KCP announced that it had hired Dana Boehmcke to be the

---

[3] Mr. Montemarano was the Director of International Licensing for
Asia from November 2003 until late March or early April of 2004,
when he became Vice President.

4

Associate Manager for Asia and that Ms. Packer had been promoted to the Associate Manager position for Europe, Canada, and the Middle East. Both Ms. Boehmcke and Ms. Packer are Caucasian.

On May 28, 2004, Cyndi Shapiro, a female employee from another department, kissed Chenette on the lips. Chenette described in her Complaint that Ms. Shapiro was apologizing for having been short with Chenette on the telephone the prior day. In her deposition, however, Chenette testified that she did not know what motivated Ms. Shapiro to kiss her but admitted that she did not believe that her gender or race had played a role. Following the incident, Chenette asked Renee Kim, an employee in the Human Resources Department ("HR"), whether it was appropriate for one employee to kiss her co-worker. Ms. Kim testified at her deposition -- to which Chenette cites with respect to this incident in her affidavit -- that this conversation occurred as the two, along with another co-worker, were waiting for an elevator and that Chenette and her co-worker "were laughing throughout." On June 1, 2004, Chenette reported the kiss to Mr. Montemarano, who, according to Chenette, told her not to report the incident to HR.[4] On June 15, 2004, Mr. Montemarano gave Chenette a midyear review. The review stated

---

[4] Chenette suggests in her 56.1 Statement as well as in her opposition brief that her complaint to Mr. Montemarano preceded her conversation about the kiss with Ms. Kim, but the evidentiary record, including Chenette's own affidavit, supports the reverse sequence.

that Chenette's overall performance was "unacceptable" and that "[her] attitude is having a negative effect on [the] international department." No other member of Chenette's department was given a midyear review.

On June 28, 2004, Chenette complained to Ms. Kim about the midyear review that she had received and about the fact that Ms. Packer had been promoted. In making this complaint, Chenette referred to statements made by Ms. Packer in which she called Chenette a "crazy Korean" and commented on Chenette's large chest size in front of Mr. Montemarano. Ms. Kim informed her supervisor in HR of Chenette's complaint. The supervisor and Ms. Kim set up a meeting for June 30, but Chenette did not attend and, instead, emailed Ms. Kim stating that she needed to reschedule. Chenette ultimately attended another meeting that Ms. Kim set up later that same day, this time with Ms. Kim and the head of the International Licensing Department, Ellen Rodriguez. At the meeting, Ms. Rodriguez apologized for any offensive remarks that had been made and told Chenette that her midyear review was meant only to steer Chenette's career at KCP back on course. Ms. Rodriguez held a meeting on July 12 with the International Licensing Department to discuss proper workplace conduct. No offensive activity took place after this meeting. Indeed, Chenette testified at her deposition that she was not subjected to any comments because of her sex, race, or

national origin after June 28, 2004, the date on which she
complained to Ms. Kim.

On July 12 and July 19, Chenette's attorney sent letters to
KCP's General Counsel alleging workplace discrimination and
harassment. The Legal Department commenced an investigation,
which involved interviewing various employees including,
ultimately, Chenette. Chenette attended her interview in late
August with her attorney but she left before its completion and
did not return to work. Partway through the interview, KCP had
excluded Chenette's attorney from the room after he repeatedly
protested Chenette's treatment and questioning. The following
day, on August 25, 2004, Chenette resigned from her position at
KCP. By letter dated August 26, 2004, KCP asked Chenette to
reconsider her decision to resign. Chenette did not respond to
KCP's letter, and this lawsuit followed.


DISCUSSION

Summary judgment may not be granted unless all of the
submissions taken together "show that there is no genuine issue
as to any material fact and that the moving party is entitled to
a judgment as a matter of law." Fed. R. Civ. P. 56(c). The
moving party bears the burden of demonstrating the absence of a
material factual question, and in making this determination the
court must view all facts in the light most favorable to the

non-moving party.  Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161,
169 (2d Cir. 2006).  In a discrimination case such as this one,
the defendant "will be entitled to summary judgment . . . unless
the plaintiff can point to evidence that reasonably supports a
finding of prohibited discrimination."  Joseph v. Leavitt, 465
F.3d 87, 90 (2d Cir. 2006).  The ultimate question is whether
the evidence, viewed in the light most favorable to the
plaintiff, would support a finding "that the defendant
intentionally discriminated against the plaintiff."  Reeves v.
Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).
Because direct evidence of discriminatory intent "will only
rarely be available, . . . affidavits and depositions must be
carefully scrutinized for circumstantial proof which, if
believed, would show discrimination."  Holcomb v. Iona College,
521 F.3d 130, 137 (2d Cir. 2008) (citation omitted).  "Even in
the discrimination context, however, a plaintiff must provide
more than conclusory allegations to resist a motion for summary
judgment."  Id.

    Chenette's claims in this lawsuit may be reduced to four
categories: failure to promote, retaliation, constructive
discharge, and hostile work environment.  Each of these
categories is addressed in turn.[5]

---

[5] Although the discussion that follows addresses the standards
governing Title VII claims, it applies as well to Chenette's

I.    Failure To Promote

Chenette contends that KCP discriminated against her on the
basis of her race and national origin when it failed to promote
her in May 2004 to the position of Associate Manager for Asia or
any other geographic region.  The defendant argues that Chenette
did not apply for the Associate Manager position and that, in
any event, she was not as well-qualified as were the two
individuals that KCP hired for the position.

Claims of employment discrimination brought pursuant to
Title VII are analyzed under the burden-shifting approach set
forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-03
(1973).  The plaintiff bears the initial burden of establishing
a prima facie case of discrimination.  Beyer v. County of
Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  To establish a prima
facie case of discriminatory failure to promote, the plaintiff
must show that:

> (1) [s]he is a member of a protected class; (2) [s]he
> is competent to perform the job or is performing [her]
> duties satisfactorily; (3) [s]he suffered an adverse
> employment decision or action; and (4) the decision or
> action occurred under circumstances giving rise to an
> inference of discrimination based on [her] membership
> in the protected class.

---

claims under the NYSHRL and NYCHRL because "New York courts
examine claims under those statutes with the same analytical
lens as corresponding Title VII-based claims."  Patane v. Clark,
508 F.3d 106, 113 (2d Cir. 2007).

Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005)
(citation omitted).  An inference of discrimination may be
raised "by showing that the employer subjected [the plaintiff]
to disparate treatment, that is, treated [her] less favorably
than a similarly situated employee outside [her] protected
group."  Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir.
2000).  A plaintiff's burden in presenting prima facie evidence
is de minimis.  Beyer, 524 F.3d at 163.

     If the plaintiff satisfies this initial burden, "a
presumption of discrimination arises and the burden shifts to
the defendant to proffer some legitimate, nondiscriminatory
reason for the adverse decision or action."  Dawson, 398 F.3d at
216.  If the defendant does so, "the presumption of
discrimination created by the prima facie case drops out of the
analysis," and the plaintiff must prove "that the legitimate
reasons offered by the defendant were not its true reasons but
were a pretext for discrimination."  Id. (citation omitted).  It
is well established, however, that "it is not the function of a
fact-finder to second-guess business decisions."  Dister v.
Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988).
Indeed, an "employer is entitled to judgment as a matter of law
if the record conclusively reveals some nondiscriminatory reason
for the employer's decision."  Richardson v. Comm'n on Human

Rights & Opportunities, --- F.3d ----, No.06-0474-cv, 2008 WL
2630055, at *9 (2d Cir. July 7, 2008) (citation omitted).

In rebutting an employer's proffered reasons and proving
that an employer's failure to promote was discriminatory, the
plaintiff must demonstrate that she was in fact "similarly
situated" to, or as well-qualified as, employees who were
treated more favorably and that the defendant discriminated
against her in declining to promote her.  Tex. Dep't of Cmty.
Affairs v. Burdine, 450 U.S. 248, 258 (1981); see Cruz v. Coach
Stores, Inc., 202 F.3d 560, 568 (2d Cir. 2000) (discussing
plaintiff's burden in context of discriminatory termination
claim).  While "an employer's disregard or misjudgment of a
plaintiff's job qualifications may undermine the credibility of
an employer's stated justification for an employment decision,"
courts must also "respect the employer's unfettered discretion
to choose among qualified candidates."  Byrnie v. Town of
Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001)
(citation omitted).  For this reason, "[w]hen a plaintiff seeks
to prevent summary judgment on the strength of a discrepancy in
qualifications ignored by an employer, . . . the plaintiff's
credentials would have to be so superior . . . that no
reasonable person . . . could have chosen the candidate selected
over the plaintiff for the job in question."  Id. (citation
omitted).

Assuming for the purpose of this motion that Chenette has met her de minimis burden of establishing a prima facie case of discriminatory failure to promote, KCP has successfully articulated legitimate, nondiscriminatory reasons for promoting other candidates over Chenette. Supported by admissible evidence, including an affidavit of Mr. Montemarano and a copy of Ms. Boehmcke's resume from when she interviewed with KCP in 2004, KCP explains that Boehmcke and Packer "were significantly more qualified and experienced than" Chenette; whereas both Boehmcke and Packer had college degrees and at least two years of full-time licensing experience when these employment decisions were made, Chenette had not yet received an undergraduate degree and had only worked in a full-time, entry-level licensing position for approximately nine months.

Because KCP has proffered legitimate, non-discriminatory reasons for its failure to promote Chenette, the burden shifts back to the plaintiff to demonstrate that KCP's proffered reasons were a pretext for discrimination. Chenette has largely abandoned the failure to promote claim in her opposition to the defendant's motion for summary judgment, devoting scant attention to it in her brief. She offers no evidence to raise a question of fact as to the superior qualifications of Boehmcke and Packer or to show that KCP's stated explanations for not

promoting her were false.  KCP is, therefore, entitled to summary judgment on Chenette's failure to promote claims.[6]


II.  Retaliation

Next, Chenette contends that she was subjected to illegal retaliation for her complaints of discrimination.  In her brief in opposition to the defendant's motion for summary judgment, as well as in her deposition testimony, Chenette suggests two theories for her retaliation claims.  The first, and chief, theory is that the negative midyear review Chenette received from her supervisor in June 2004 was conducted in retaliation for her reporting to him and an HR employee that Ms. Shapiro had kissed Chenette on the lips.  Chenette's second theory is that the August 24, 2004 interview she attended with her attorney was "retaliatory" because "it was made clear to plaintiff that no actions would be taken against those employees who had perpetrated discriminatory conduct against her, and instead she would be the target of the 'investigation.'"[7]  With respect to the first of these theories, the defendant contends that

_____

[6] In addressing this motion for summary judgment, the Court has scrutinized the documents and deposition transcripts to the extent that they are cited in the parties' briefs or in their 56.1 Statements but has not otherwise scoured the record to develop facts which may be in the plaintiff's favor.

[7] Neither of these theories is clearly set forth in Chenette's Complaint in this action, but KCP does not assert a notice-based argument in its motion for summary judgment.

Chenette neither believed nor suggested to her supervisor or to HR that the conduct of which she complained was discriminatory, that no causal connection exists between Chenette's complaint and her midyear review, and that, in any event, a negative evaluation does not constitute a retaliatory act under Title VII.  KCP devotes less attention to Chenette's second theory of retaliation, but it asserts that the interview was conducted for legitimate business reasons and was not carried out in a discriminatory manner.

To establish a prima facie case of retaliation, a plaintiff must show: "[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action."  Richardson, 2008 WL 2630055, at *6.  For a plaintiff's conduct to constitute participation in a protected activity, it is enough that she has made "informal protests of discrimination, including making complaints to management."  Gregory v. Daly, 243 F.3d 687, 700–01 (2d Cir. 2001) (citation omitted).  Moreover, "an employment practice need not actually violate Title VII for the protected activities element of a retaliation claim to be satisfied."  McMenemy v. City of Rochester, 241 F.3d 279, 285 (2d Cir. 2001).  Rather, the plaintiff "need only have had a good faith, reasonable belief that [s]he was opposing an employment practice

made unlawful by Title VII." Kessler v. Westchester County Dep't of Legal Servs., 461 F.3d 199, 210 (2d Cir. 2006) (citation omitted). Whether a plaintiff's belief is reasonable must be "assessed in light of the totality of the circumstances." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998). The knowledge factor requires only a showing of "general corporate knowledge that the plaintiff has engaged in a protected activity." Patane, 508 F.3d at 115 (citation omitted). But, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." Galdieri-Ambrosini, 136 F.3d at 292.

With respect to the second element, an adverse employment action is one "that a reasonable employee would have found . . . materially adverse, which in [the retaliation] context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (citation omitted). But, "the significance of any given act of retaliation will often depend upon the particular circumstances," and "petty slights or minor annoyances" are not actionable. Id. at 68-69. This standard is broader than that which is applied under the

substantive antidiscrimination provision of Title VII, and
"extends beyond workplace-related or employment-related
retaliatory acts and harm." Id. at 67. Adverse employment
actions in the context of a discrimination claim are limited to
actions "that affect the terms and conditions of employment."
Id. at 64. Finally, with respect to the final element of the
prima facie case, a causal connection may be inferred by the
"temporal proximity" between the protected activity and the
alleged retaliatory action. Feingold v. New York, 366 F.3d 138,
156 (2d Cir. 2004).

A. Negative performance evaluation

Chenette's first theory in support of her retaliation claim
fails as a matter of law because she has not submitted evidence
from which a reasonable jury could conclude that she engaged in
any protected activity known to KCP before she received the
negative employment evaluation. Chenette's own account, as
described in her Complaint as well as in her affidavit,[8] of her
report to Mr. Montemarano regarding the kiss incident is that

_____

[8] On July 1, 2008, KCP filed a motion to strike substantial
portions of Chenette's affidavit and 56.1 Statement. The
affidavit contains several broad assertions not supported by
specific facts and personal knowledge, as required under Federal
Rule of Civil Procedure 56(e); the 56.1 Statement contains legal
argument and conclusory assertions in violation of Local Rule
56.1's requirement that such submissions be restricted to
concise statements of material facts. In deciding the
defendant's motion for summary judgment, the Court has ignored
all portions of Chenette's affidavit and 56.1 Statement which
contain improper legal argument and unsupported assertions.

she "told Mr. Montemarano what took place regarding the incident on May 28, with Ms. Shapiro" and stated that she "was scared and uncomfortable being around [Shapiro]." Chenette also states in her affidavit that she had earlier asked Ms. Kim in HR whether "it was alright if someone kissed me," and she incorporates into her affidavit Ms. Kim's deposition account of the conversation, which describes that it occurred at an elevator bank while another employee was present and laughing with Chenette throughout. Nothing in these descriptions would have suggested to Mr. Montemarano -- Chenette's supervisor -- or to Ms. Kim -- the HR employee -- that Chenette believed gender, race, or national origin discrimination motivated the conduct of which she complained. Indeed, when asked at her deposition whether she believed that Ms. Shapiro kissed her "because you're a female" or "because of the fact that you are Korean," Chenette replied "no" both times.

Even when the evidence is viewed in the light most favorable to Chenette, therefore, she has not presented evidence to raise a question of fact as to the existence of a good faith belief that she had been the victim of discrimination or that KCP was on notice that she was complaining of conduct prohibited by Title VII. Chenette has thus failed to raise a genuine issue of fact concerning the first prong of her prima facie case,

rendering summary judgment appropriate on Chenette's first theory of retaliation.

B. Investigation and interview

Although the parties focus less attention on Chenette's second theory of retaliation, disputed issues of fact exist in the record which preclude summary judgment on this theory. The first and third elements of Chenette's prima facie case are met here because KCP does not dispute that the letters which Chenette's attorney submitted on her behalf qualified as protected activity and that its investigation and interview of Chenette were undertaken in response to this protected activity. As to the second element, it is undisputed that Chenette's attorney was made to leave partway through the interview; in addition, Chenette has attested that she was subjected to repetitive questioning and was frequently cut off when she spoke. She contends that the hostility which her employer exhibited directly to her and her attorney led her to believe that her complaint would not be treated fairly. If this evidence is fully credited, it is sufficient to raise a question of fact as to whether such treatment would dissuade a reasonable employee from making or pursuing a charge of discrimination. The weight that should be accorded to Chenette's depiction of her interview and, in light of that weight, whether the conditions she describes constitute a retaliatory adverse

employment action are determinations properly made by the fact-finder at trial.  Summary judgment on this theory of Chenette's retaliation claim is, therefore, denied.


    III. Constructive Discharge

    Chenette also claims that KCP constructively discharged her on account of her sex, race, and national origin.  The conditions to which Chenette points as having compelled her resignation are the alleged discriminatory comments that were made in the workplace, the kiss from her co-worker, the subsequent negative midyear performance review she received from her supervisor, and the "horrific" interview she endured as part of KCP's purported investigation of her discrimination complaints.  The defendant contends that it is entitled to summary judgment on Chenette's constructive discharge claim because, with the exception of the investigation into her complaint, Chenette has alleged no instances of discriminatory conduct during the two months between June 28, 2004 -- the date on which Chenette complained about Ms. Packer's promotion to Ms. Kim -- and her resignation on August 25, 2004.  With respect to Chenette's objection to her interview and KCP's investigation more generally, KCP argues that a company's investigation of an employee's claims of wrongful workplace conduct cannot support a constructive discharge claim.

To succeed on a claim for constructive discharge, the plaintiff must first establish the existence of a hostile work environment by showing "harassing behavior sufficiently severe or pervasive to alter the conditions of [her] employment." Pa. State Police v. Suders, 542 U.S. 129, 133 (2004) (citation omitted). The plaintiff must then make the further showing "that the abusive working environment became so intolerable that her resignation qualified as a fitting response." Id. at 134. In doing so, the plaintiff must "demonstrate that the employer's actions were deliberate and not merely negligent or ineffective," and that these actions created "the sort of circumstance that would cause a reasonable person to conclude that quitting was the only way she could extricate herself from intolerable conditions." Petrosino v. Bell Atlantic, 385 F.3d 210, 230-31 (2d Cir. 2004). Upon such a showing, "an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." Pa. State Police, 542 U.S. at 141. Factors that have been deemed legally insufficient when standing alone to support a claim of constructive discharge include "dissatisfaction with assignments," an "employee's perception of undue criticism or excessive monitoring," and "difficult or unpleasant conditions." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 90 (2d Cir. 1996).

In this case, any incidents of misconduct that preceded Chenette's June 28, 2004 complaint to Ms. Kim do not, without more, support Chenette's constructive discharge claim. Because Chenette resigned nearly two months later and points to no offensive conduct, apart from KCP's investigation, that occurred during that two-month period, she cannot show that resigning was the only way to extricate herself from intolerable conditions.

Chenette, however, characterizes the investigatory interview that KCP conducted of her the day before she resigned as harassing. She states in her affidavit that she was "cut off" anytime she began to describe discriminatory conduct, was subjected to "repetitive and sometimes nonsensical" questions, and was prevented from reviewing her attorney's letter containing a chronological history of the misconduct she alleged. Chenette further argues that she felt compelled to resign because she "obtained no adequate response" from KCP following her June 28, 2004 complaint to HR and her attorney's letters to KCP's legal department. No reasonable jury can find that these circumstances, preceded by nearly two months of peace in the workplace, amount to conditions so intolerable as to compel a reasonable person to resign.[9] KCP is, therefore,

---

[9] In her affidavit, Chenette complains that KCP did not discipline the employees implicated by her complaint, asserting that "KCP was not going to meaningfully address the hostile work environment that I was subject to, which meant that it would

entitled to summary judgment on Chenette's claims of constructive discharge.[10]

IV.  Hostile Work Environment

Finally, Chenette contends that she was subjected to a discriminatorily hostile work environment based on her sex, race, and national origin.  The defendant contends that Chenette has not offered any evidence to establish that she was subjected to the wrongful conduct because of her sex, race, or national origin.  Moreover, it argues, even if Chenette has shown discriminatory conduct, KCP's intervention was swift and effective, allowing it to prevail on the Faragher/Ellerth affirmative defense.

_____

continue, and instead KCP was turning the tables and placing me in an intimidating and defensive position."  These conclusory allegations fail to raise a genuine issue of fact, and, in any event, nothing in Title VII requires employers to take punitive actions against employees accused of misconduct.  It is undisputed that the activities by her co-workers which Chenette characterizes as creating a hostile work environment ceased after Ms. Rodriguez's July 12 meeting with her department and her explanation of the company's expectations for workplace behavior.

[10] This conclusion is reinforced by the fact that KCP wrote to Chenette upon receiving her letter of resignation and asked that she reconsider her decision -- a fact that weighs against an inference of deliberately abusive conduct by KCP.  See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2d Cir. 2000) (affirming grant of summary judgment to employer on employees' constructive discharge claim under § 1981 in part because the defendant had demonstrated an interest in continuing to employ plaintiffs).

Title VII prohibits "a discriminatorily hostile or abusive [work] environment." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993). To prevail on a claim that harassment caused a hostile work environment in violation of Title VII, a plaintiff must establish: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." <u>Petrosino</u>, 385 F.3d at 221 (citation omitted).

Unlike claims of discrimination based on disparate treatment or retaliation, a hostile work environment claim is "based on the cumulative effect of individual acts." <u>Nat'l R.R.</u> <u>Passenger Corp. v. Morgan</u>, 536 U.S. 101, 115 (2002). A hostile work environment claim must, moreover, meet both an objective and a subjective standard. Not only must the victim herself "subjectively perceive [the] environment to be abusive," but the misconduct of which a plaintiff complains also must be "severe or pervasive enough to create an objectively hostile or abusive work environment." <u>Petrosino</u>, 385 F.3d at 221 (citation omitted). As a general matter, the conduct of which a plaintiff complains "must be sufficiently continuous and concerted in order to be deemed pervasive." <u>Feingold</u>, 366 F.3d at 150 (citation omitted). "Isolated acts, unless very serious, do not

23

meet the threshold of severity or pervasiveness." Alfano v.
Costello, 294 F.3d 365, 374 (2d Cir. 2002). Rather, a plaintiff
must demonstrate "that her workplace was permeated with
discriminatory intimidation, ridicule, and insult, that was
sufficiently severe or pervasive to alter the conditions of her
employment." Petrosino, 385 F.3d at 223 (citation omitted).
Because Title VII prohibits only discriminatory workplace
behavior, a hostile work environment arises only where the
relevant conduct occurred "because of" the plaintiff's
membership in a protected class. See Alfano 294 F.3d at 374.
The Supreme Court has made clear, however, that "sex
discrimination consisting of same-sex sexual harassment is
actionable under Title VII." Oncale v. Sudowner Offshore
Servs., Inc., 523 U.S. 75, 82 (1998).

     Where the conduct creating a hostile work environment is
committed by non-supervisory co-workers, the plaintiff must show
that the employer knew of the discriminatory conduct and did not
take appropriate actions to remedy it. See Petrosino, 385 F.3d
at 225 (addressing sex-based hostile work environment claim).
"Where the harassment is attributed to a supervisor with
immediate or successively higher authority over the employee, a
court looks first to whether the supervisor's behavior
culminated in a tangible employment action against the
employee." Id. (citation omitted). In this context, a tangible

employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Pa. State Police, 542 U.S. at 144. If such action was taken, the employer is held vicariously liable. Petrosino, 385 F.3d at 225.

An employer will be liable for a hostile work environment created by its supervisory employees even absent a tangible employment action unless it can establish the Faragher/Ellerth affirmative defense by showing that: "(a) it exercised reasonable care to prevent and correct promptly any discriminatory harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ferraro v. Kellwood Co., 440 F.3d 96, 102 (2d Cir. 2006) (citation omitted). The first element may be shown by "the existence of an antiharassment policy during the period of the plaintiff's employment, although that fact alone is not always dispositive." Id. For the second element, "proof that an employee has unreasonably failed to use the employer's complaint procedure normally suffices to satisfy the employer's burden." Id. If, however, "the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate." Whidbee, 223

F.3d at 73 (citation omitted) (addressing hostile work environment claim under § 1981).

Considering the record evidence in the light most favorable to the plaintiff, Chenette has raised triable questions of fact with respect to the first prong of her hostile work environment claim. But, even if Chenette were ultimately successful at trial in proving that her work environment was sufficiently abusive and that supervisory employees participated in or knew of the discriminatory conduct, KCP has established that it would be entitled to judgment in its favor based on its prompt and effective remedial actions. As a preliminary matter, the Faragher/Ellerth defense is available to KCP because Chenette does not argue that her alleged hostile work environment culminated in any tangible employment actions.[11]

As to the first element of KCP's defense, it is undisputed that during Chenette's employment, KCP maintained clear policies against discrimination and harassment, which it published in its Employee Handbook and Code of Conduct. It also outlined specific reporting procedures for employees who witnessed or were subjected to discriminatory conduct. At the commencement of her full-time employment, Chenette received a copy of the

_____

[11] While Chenette has not pointed to any tangible employment action that culminated from the hostile work environment, as already discussed, KCP has shown that Chenette's failure to promote and constructive discharge claims fail as a matter of law.

Employee Handbook and signed an acknowledgment stating that she had reviewed its contents. KCP has, moreover, established that its complaint procedures were effective in this case: as soon as Chenette reported discriminatory statements to Ms. Kim on June 28, 2004, an entry-level HR employee, the defendant took actions to end any inappropriate behavior in the International Licensing Department, and Chenette points to no further instances of harassing conduct within her department after that date.[12] Summary judgment is, thus, appropriate on this element.

KCP has also established that no genuine issue of fact exists with regard to the second element of its defense. To the extent that Chenette complains that KCP did not take remedial actions before her June 28, 2004 complaint, she has provided no evidence from which a reasonable jury could conclude that she attempted to take advantage of KCP's stated complaint procedures before that date. Indeed, the fact that no further offensive conduct occurred after Chenette's complaint to Ms. Kim demonstrates that corrective opportunities were available to

---

[12] According to KCP's written procedures, in the event that reporting misconduct to a supervisor "is not practical, or does not correct the perceived violations, associates should contact the appropriate Director of Human Resources or another appropriate executive in the Human Resources Department." Chenette's discussion with Ms. Kim did not, strictly speaking, adhere to these guidelines given Ms. Kim's junior status. Nonetheless, Ms. Kim immediately alerted her superiors in HR to Chenette's complaint, and KCP's prompt remedial actions followed.

Chenette and that her failure to take advantage of these opportunities sooner was unreasonable. The record contains no evidence that would reasonably support a contrary conclusion.

Chenette makes essentially three arguments in favor of imputing liability to KCP, but each is unavailing here. First, she asserts that KCP's response to her allegations of discrimination was inadequate because KCP took no punitive actions against the employees implicated by her complaints and by KCP's subsequent investigation. Chenette, however, points to no legal requirement that an employer discipline employees where it succeeds in eradicating the offensive behavior from the workplace by other means. To the contrary, the Second Circuit has stated that an employer's response need only be "sufficiently calculated to end the harassment." Murray v. New York Univ. Coll. of Dentistry, 57 F.3d 243, 250 (2d Cir. 1995).

Second, Chenette contends that KCP was on notice of her hostile work environment even before her June 28, 2004 complaints to Ms. Kim but that it failed to act promptly. Specifically, Chenette asserts that Ms. Rodriguez and Mr. Montemarano, both supervisory employees, were present when at least some of the harassment occurred, and further that KCP's HR employees sat in close proximity to the International Licensing Department, which leads her to speculate that they must have heard the misconduct and failed to act. She also cites to her

earlier conversation with Ms. Kim regarding the kiss incident. These contentions, even if adequately supported by admissible evidence, are immaterial because, for the reasons already described, the Ellerth/Faragher affirmative defense protects KCP from vicarious liability for the complicity or improper behavior of its supervisory employees. The first time that Chenette could be said to have taken advantage of KCP's complaint procedures was when she spoke with Ms. Kim on June 28. Accordingly, the fact that supervisors in the International Licensing Department or employees in HR may have heard the harassment of which Chenette complains does not serve to defeat KCP's affirmative defense.

Finally, Chenette asserts that her August 24, 2004 interview by the KCP legal staff was in itself abusive and aimed at harassing her. She seems to argue that this is evidence that KCP did not act promptly to eliminate the hostile workplace but instead added to her harassment. This final attempt to salvage her hostile work environment claim also fails. The August 24 interview, even if offensive, does not raise a question of fact as to whether Ms. Rodriguez's speech on July 12 to her department cured the hostile work environment created by co-workers' salacious and offensive comments. The interview occurred weeks later; it was undertaken by the legal department, and not the actors who were responsible for the earlier abuse;

and the nature of the mistreatment represented by the interview

was of an altogether different kind from the earlier harassment.

The August 24 interview, therefore, is not evidence that KCP

failed to correct promptly the earlier harassment and does not

undermine KCP's defense to Chenette's hostile work environment

claim.

CONCLUSION

The defendant's May 23, 2008 motion for summary judgment is

granted with respect to the plaintiff's failure to promote,

constructive discharge, and hostile work environment claims.   It

is denied in part with respect to one of her retaliation claims.

SO ORDERED:

Dated:    New York, New York
          August 6, 2008

                                    DENISE COTE
                          United States District Judge

30